**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **KEILY GROCERY AND DELI, INC.**, <br><br> Plaintiff, <br><br> v. <br><br> **UNITED STATES OF AMERICA**, <br><br> Defendant. | Civil Action No. 24-8043 (ZNQ) (TJB) <br><br> **OPINION** |

**QURAISHI, District Judge**

**THIS MATTER** comes before the Court upon a Motion for Summary Judgment filed by Defendant United States of America ("Defendant"). ("Motion," ECF No. 14.) Defendant submitted a brief in support of the Motion ("Moving Br.," ECF No. 14-3) and a Statement of Facts ("DSOF," ECF No. 14-1). Plaintiff Keily Grocery and Deli, Inc. ("Plaintiff" or "the Store") filed a brief in opposition to the Motion ("Opp'n Br.," ECF No. 17) and a response and counterstatement to Defendant's Statement of Facts (ECF No. 17-1). Defendant filed a reply brief. ("Reply Br.," ECF No. 21.)

The Court has carefully considered the parties' submissions and decides the Motion without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. For the reasons set forth below, the Court will **GRANT** Defendant's Motion and enter **JUDGMENT** in favor of Defendant and against Plaintiff.

1

I.       **BACKGROUND AND PROCEDURAL HISTORY**

   A.       **THE STORE AND FNS'S INVESTIGATION**

Plaintiff is a convenience store located in Trenton, New Jersey. (ECF Nos. 13-1 through 13-10, Administrative Record ("A.R.") 1.)[1] The Store is approximately 650 square feet and has two aisles and a deli case. (A.R. 303, 313.) The Store sells "inexpensive common prepackaged staple food items, single use items," snacks, beverages, . . . fresh produce," deli meats and cheeses by the pound, and hot prepared foods. (*Id.*) The Store also sells Supplemental Nutrition Assistance Program ("SNAP") ineligible items, including tobacco, automotive supplies, and health and beauty aids. (A.R. 303.)

The Store was authorized to participate in SNAP as a retailer on February 10, 2023. (A.R. 244–45.) Soon thereafter, the United States Department of Agriculture ("USDA") Food and Nutrition Service Retailer Operations Division ("FNS") began an investigation into the Store because the agency's "ALERT" System "indicated that the Store's Electronic Benefit Transfer ("EBT") data contained patterns consistent with possible EBT trafficking violations." (DSOF ¶ 11, A.R. 301.) To further investigate these potential violations, FNS visited the Store on September 22, 2023.[2] (A.R. 302.)

During FNS's investigation, no shopping carts or handheld baskets were available for customer use. (A.R. 303.) Additionally, one checkout counter, one cash register, one EBT point of sale ("POS") device, one optical scanner, and two storage freezers were observed in the Store. (A.R. 303, 313.) The visit also revealed that the Store did not have additional storage area outside

---

[1] In Plaintiff's responsive statement of facts, Plaintiff denies certain facts supported by the administrative record but does not offer any factual support of these denials. (See ECF No. 17-1.) Consequently, the Court treats all facts contained in the certified administrative record as undisputed for the purposes of this motion. *See* Fed. R. Civ. P. 56(e)(2).

[2] A store manager consented to the visit. (A.R. 302.)

of public view and did not store food offsite. (A.R. 303.) The Store did not have a wholesale business and did not offer discounts for the purchase of bulk food bundles, specials, or packages. (A.R. 303.) Additionally, the Store did not have an unusual price structure, such as prices ending with ".00" cents. (*Id.*)

As part of FNS's investigation, FNS reviewed the Store's SNAP EBT data from April 1, 2023 through September 30, 2023, consisting of 3,908 EBT transactions. (A.R. 307). Of these transactions, 948 were labeled as "suspicious" and grouped into one of three patterns. (A.R. 331–359.)

The first pattern includes 117 transactions containing the repetitive occurrence of a given dollar value ("Pattern 1"). (A.R. 307, 331–333.) Specifically, these transactions had repeated dollar values of $40.xx, $50.xx, $99.xx, and $119.xx. (*Id.*) Additionally, 34 out of 56, or 60.7%, of the sample transactions in Pattern 1 ended with ".00." (A.R. 307–308.) FNS found it would be difficult to achieve those transactions based on the Store's pricing structure. (*Id.*) Similarly, 17 out of 40, or 42.5% of the sample transactions ended with ".99," which also would be difficult to achieve based on the Store's pricing structure. (A.R. 308–309.)

The second pattern detected involved rapid and repetitive transactions in a short period of time by the same households ("Pattern 2"). (A.R. 310.) 132 sets of transactions (consisting of 339 individual transactions) were made by 74 different households, in which a household's EBT card was used repeatedly within a 24-hour period. (A.R. 310, 334–350.) Most notably, 43 transaction sets involved multiple transactions completed under one minute. (A.R. 310.) FNS concluded that this was suspicious considering the Store's lack of shopping baskets or carts, the layout of the check-out area, the several steps necessary to complete a transaction, and the large dollar amounts involved. (*Id.*) 11 transaction sets also had repeat amounts (i.e., transactions ending with .00, .50,

and .99). (A.R. 311.) FNS found those transactions suspicious because the Store did not have a pricing structure that would allow for dollar amounts to be easily replicated and it concluded that households would be unlikely to collect the items needed to match these amounts in a short period of time. (*Id.*) For example, the first transaction set in Pattern 2 involved one household completing a transaction for $75.00 and completing a second transaction for $75.00 28 seconds later. (A.R. 311.) Another transaction set involved one household completing six transactions for $100.00 each within four minutes. (*Id.*)

The third pattern detected involved 492 transactions that were higher than 85% of all convenience store purchase transactions ("Pattern 3"). (A.R. 311, 351–359.) During the investigatory period, the average convenience store purchase amount was $10.43, and the average supermarket transaction amount was $77.91. (A.R. 311, 312.) Comparatively, the Store had an average transaction amount of $77.91 in the 25 largest transactions amounts during the investigatory period. (A.R. 312.) FNS compared the Store's EBT data against three nearby convenience stores and found that the Store had significantly more transactions in the categories at issue (*i.e.*, Patterns 1, 2, and 3), with no explanation from the Store that would justify the discrepancies. (A.R. 315–317.) Comparing the transaction data to the Store's physical makeup, inventory, and the traditional behavior of SNAP beneficiaries, FNS determined that the Pattern 3 transactions were suspicious and likely indicative of trafficking. (A.R. 312–313.)

Additionally, FNS reviewed the shopping patterns of five selected households that were involved in suspicious transactions during the investigatory period. (A.R. 318–326.) FNS found that these households were also shopping at larger and better stocked stores, often making visits to these larger stores on the same day or close in time to a suspicious transaction. (*Id.*) FNS

determined it was unreasonable for a household to spend a large amount of SNAP benefits at the Store, as the households had access to larger, better stocked grocery options nearby. (*Id.*)

### B. THE CHARGING LETTER

On March 14, 2024, FNS sent a letter to the Store (the "Charging Letter"), informing the Store that FNS was charging it with trafficking under 7 C.F.R. § 271.2 and was considering permanently disqualifying the Store from participating in the SNAP program. (A.R. 328–330.) The Charging Letter explained that FNS's analysis of the Store's EBT transactions for April 2023 through September 2023 established clear and repetitive patterns of unusual, irregular, and inexplicable activity for a convenience store. (A.R. 328.) Additionally, the Charging Letter explained that the Store: (1) had the right to respond to the charges within 10 days of receiving the letter, and (2) could request a civil monetary penalty in lieu of permanent disqualification by presenting information to show that the Store met the criteria established in 7 C.F.R. § 278.6(i). (A.R. 329–330.)

The Store received the Charging Letter on March 18, 2024. (A.R. 375.) On March 27, 2024, the Store responded, contending that its credit card machines only accept up to an identified amount at a time for SNAP purchases and that the machines did not indicate what is purchased, which is not a SNAP violation. (A.R. 384–385.) The Store argued that "it does not matter if there were many transactions in repeated dollar amounts," and that it was "of no consequence" that multiple transactions were made by the same households within a set time or that there were unusually high transaction amounts. (*Id.*) The Store also noted that it was being restocked during the investigation. (A.R. 385.) The Store did not submit any evidence with its response letter.

(A.R. 384–385.)  The Store closed its letter by requesting that FNS issue no penalty against the Store.  (*Id.*)

FNS reviewed the response letter and concluded that it did not sufficiently explain the Store's suspicious transactions.  (A.R. 386–395.)  FNS determined that, based on all the evidence—the Store's characteristics, the transactions listed in the Charging Letter, households' shopping patterns, and the Store's transaction patterns—trafficking was more likely than not occurring and, as such, permanent disqualification was an appropriate sanction.  (A.R. 389.)  Permanent disqualification was deemed appropriate because the Store failed to submit sufficient evidence to demonstrate that it had established and implemented an effective compliance program to prevent SNAP violations.  (A.R. 390.)  FNS memorialized such in a determination letter dated April 29, 2024.  (A.R. 390–392.)

### C.   ADMINISTRATIVE REVIEW

On May 7, 2024, the Store requested administrative review of the trafficking determination.  (A.R. 399–400.)  In its letter in support of its request for review, the Store argued that its POS system does not identify what items are purchased in each transaction. (A.R. 408.)  The Store also argued that FNS assumed that SNAP violations occurred because the purchased merchandise was not identified and there were transactions in repeated dollar amounts.  (*Id.*)  The Store conceded that it did not have any documentation to support its argument, but invited FNS to visit the Store again to witness how the POS system operates.[3]  (A.R. 408.)

On June 26, 2024, FNS issued its Final Agency Decision ("FAD"), which concluded that there was sufficient evidence to support a finding that the Store's permanent disqualification from the SNAP program was appropriate.  (A.R. 410–423.)  In the FAD, the Administrative Review

---

[3] FNS did not visit the Store again.

6

Officer ("ARO") stated that the Store bears the burden of proving by a preponderance of the evidence that the administrative actions should be reversed. (A.R. 412.) The ARO analyzed the information and explained that given the Store's available inventory and the Store's characteristics, there was no indication that the Store would experience redemption patterns that differed significantly from similarly sized competitor stores. (A.R. 414–422.)

As to transactions in Pattern 1, the ARO explained that such a pattern unsupported by special pricing structures "are a strong indicator of trafficking in SNAP benefit[s]." (A.R. 417.) The ARO concluded that "[r]andom data, which legitimate transaction activity approximates, is extremely difficult to produce intentionally." (A.R. 417.) The ARO found it "implausible" that 117 transactions resulted in the same dollar values by different customers because the Store does not have packaged items that would lead to this result. (*Id.*)

As to transactions in Pattern 2, multiple transactions in a short period of time by the same household, the ARO explained that violating stores often use this tactic to avoid single, high dollar transactions that cannot be supported by the Store's inventory or structure. (*Id.*) The ARO noted that even if multiple transactions per day is not unusual, such transactions were inconsistent with the Store's stock and facilities. (A.R. 19.) The ARO also emphasized how the multiple steps involved in making a purchase with SNAP benefits (placing items on the counter to be rung up, given the small counter space; separating eligible from ineligible items; weighing individual items if sold by weight; entering prices into the register as applicable; bagging items; handing the customer the bagged items to make room for additional food items; informing the customer of the total; pressing the "SNAP transaction key" on the POS; swiping the EBT card and pressing the appropriate buttons to process the sale; entering the customer's PIN; the system processing and approving the transaction; printing the receipt; removing the purchased items from the checkout

area) undermine the likelihood that multiple high dollar transactions involving the sale of eligible foods could be made within a few seconds or minutes. (A.R. 420.) The ARO highlighted that the Store processed the transactions faster than larger supermarkets, even though the Store has a less sophisticated and smaller checkout area than a typical supermarket. (*Id.*) The ARO questioned why SNAP customers would shop at the Store multiple times in a short period and purchase a large number of items given the Store's lack of product variety or price advantage as compared to nearby stores. (*Id.*) Additionally, the ARO rejected Plaintiff's argument that its credit card machines only accept up to a certain amount at a time with SNAP purchases because the Store did not present any such evidence. (A.R. 420–421.)

As to transactions in Pattern 3, the ARO explained that the Store's limited stock and small facilities called into question the legitimacy of the transactions. (A.R. 421.) The ARO noted that the FNS store visit indicated that the Store did not offer special or custom services like delivery or specialty goods, nor did it offer promotions or wholesale business. (*Id.*) Additionally, the ARO noted that customers had access to other stores, including larger stores, and determined it was unlikely that SNAP recipients would regularly purchase large amounts of merchandise at the Store when larger, better-stocked stores were nearby. (A.R. 422.) In response to the Store's argument that there was a presumption that it was automatically violating SNAP because it does not have a POS system that identified what is being purchased, the ARO explained that FNS relied on an extensive analysis of the transaction data and patterns, together with other factors like store visit observations, customer shopping behavior analysis, and store comparison. (*Id.*)

Finally, the ARO determined that FNS properly decided that the Store was not eligible for a civil monetary penalty because: (1) it did not notify FNS that it wanted to be considered for a civil monetary penalty instead of permanent disqualification; and (2) had not timely produced

documentation of an effective compliance policy as required by 7 C.F.R. § 278.6(b)(2) and 278.6(i). (A.R. 423.)

## II. SUBJECT MATTER JURISDICTION

This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1346(a)(2) given that the United States is the defendant.

## III. LEGAL STANDARD

### A. SUMMARY JUDGMENT

When an "aggrieved" party seeks "judicial review" of an adverse "final determination" with regard to participation in SNAP, 7 U.S.C. § 2023(a)(13), "[t]he suit in the United States district court . . . shall be a trial de novo by the court in which the court shall determine the validity of the questioned administrative action in issue." § 2023(a)(15). Thus, although the Court is reviewing a final agency determination, the governing statute provides that this case shall proceed in the same manner as a typical civil action.

Summary judgment shall be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it will "affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if it could lead a "reasonable jury [to] return a verdict for the nonmoving party." *Id.*

"[W]hen a properly supported motion for summary judgment [has been] made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson*, 477 U.S. at 250 (citing Fed. R. Civ. P. 56(e)). In the face of a properly supported motion for summary judgment, the nonmovant's burden is rigorous: it "must point to concrete evidence in the record;" mere allegations, conclusions, conjecture, and speculation will not defeat summary judgment.

*Orsatti v. New Jersey State Police*, 71 F.3d 480, 484 (3d Cir. 1995); *accord, Jackson v. Danberg*, 594 F.3d 210, 227 (3d Cir. 2010) (citing *Acumed LLC v. Advanced Surgical Servs., Inc.*, 561 F.3d 199, 228 (3d Cir. 2009) ("[S]peculation and conjecture may not defeat summary judgment.")). "Failure to sustain this burden will result in entry of judgment for the moving party." *Cedar Food Market 7, Inc. v. United States*, Civ. No. 18-3470, 2019 WL 6907489, *4 (D.N.J. Dec. 19, 2019).

### B. SUITS UNDER 7 U.S.C. § 2203(a)(15)

"Congress has deployed an elaborate remedial regime to ensure that SNAP benefits 'are used only to purchase eligible food items, and are not exchanged for cash or other things of value.'" *Irobe v. United States Dep't of Agric.*, 890 F.3d 371, 378 (1st Cir. 2018) (quoting *Idias*, 359 F.3d 695, 697 (4th Cir. 2004)). The Court's review consists of two parts.

First, the Court must review whether a violation occurred. Although the Third Circuit has not yet spoken on the issue, "[i]t is [ ] well established that the plaintiff challenging the administrative action has the burden of proving by a preponderance of the evidence that the charged SNAP violation did not occur." *Atl. Deli & Grocery v. United States*, Civ. Civ. No. 10-4363, 2011 WL 2038758, at *4 (D.N.J. May 23, 2011). *See also, Irobe*, 890 F.3d at 378 ("All of the courts of appeals that have addressed the burden-of-proof issues under Section 2023 have placed the burden of proof on the party challenging the USDA's finding of liability. We join those courts and hold that when a store challenges USDA's determination that the store trafficked in SNAP benefits, the store bears the burden of proving by a preponderance of the evidence that its conduct was lawful.") (citing decisions from the 5th, 6th, 7th, and 9th Circuits); *SS Grocery, Inc. v. U.S. Dep't of Agric.*, 340 F. Supp. 3d 172, 180 (E.D.N.Y. 2018) ("Plaintiffs . . . bear the burden of proving by a preponderance of the evidence that the agency's action was invalid."). Shifting the burden to the store makes sense: "[a] store is in the best position to show what actually happens

10

on its premises. Allocating the burden of proof to the store tacitly recognizes this reality and, in the bargain, incentivizes shopkeepers to maintain accurate records of all SNAP transactions." *Irobe*, 890 F.3d at 378.

Second, the Court must determine whether the sanction imposed is appropriate. "The standard of review for the imposition of a sanction under SNAP is whether the Secretary's action was arbitrary or capricious, i.e., whether it was unwarranted in law or without justification in fact." *White Horse No. 2 v. United States,* Civ. No. 11-1538, 2012 WL 1533468, at *3 (D.N.J. Apr. 30, 2012) (citations and interior quotation marks omitted). Accordingly, the plaintiff challenging the sanction "has the burden of introducing evidence into the record that would allow the Court to conclude that the agency's determination . . . is unwarranted in law or fact." *Id.*

## IV.  DISCUSSION

### A.  WHETHER A VIOLATION OCCURRED

Here, the Store has not provided any evidence that it did not traffic in SNAP benefits—not to FNS, not in the administrative proceeding, and not here. The Store merely offers conclusions, speculation, and creative theories as to why it did not traffic benefits. Without data, receipts, detailed declarations, or any other form of evidence, the Store simply cannot meet its burden to establish the validity of even one of the nearly 1,000 suspicious transactions identified by FNS.

The Store insists that FNS's transaction data is not inherently indicative of trafficking. *See* DSOF ¶¶ 58–62; 74–77; Compl. ¶¶ 6–8, 11. But the Store ignores the fact that the transaction data was not considered in isolation. FNS considered other evidence in combination with the transaction data, including customer shopping habits, the Store's structure and layout, the Store's stock, and comparisons to other local convenience and grocery stores.

11

Additionally, the Store argues that FNS assumes SNAP violations because the Store's POS system does not identify what was purchased. DSOF ¶¶ 58–62, 74–77. However, the Store cannot merely implement inadequate technology and procedures only to then throw up its hands and claim it lacks the ability to present evidence to refute FNS's allegations. This "would have the perverse effect of rewarding businesses for shoddy record-keeping." *Irobe*, 890 F.3d at 378 (citing *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946) (explaining, in analogous context, that holding otherwise would "place a premium on an employer's failure to keep records"); *Crooker v. Sexton Motors, Inc.*, 469 F.2d 206, 2011 (1st Cir. 1972) (explaining, in labor-law context, advantage of imposing evidentiary burden on party in the "best position to maintain records")).

Congress has explicitly authorized consideration of both transaction information gleaned from EBT databases and reports of on-site investigations as tools in the USDA's efforts to detect fraud. *See* 7 U.S.C. § 2021(a)(2); *see also* 7 C.F.R. § 278.6(a). "[S]uch information and reports may be probative of trafficking; in appropriate cases, they may be sources of circumstantial evidence of fraud, sufficient to prove that a store is trafficking in SNAP benefits." *Irobe*, 890 F.3d at 379 (citing *Idias v. U.S.*, 359 F.3d 695, 698 (4th Cir. 2004)).

Here, the transaction data discloses more than 948 suspicious transactions at the Store that can be grouped into three buckets:

- Pattern 1: 117 transactions resulted in repeated dollar values of $40.xx, $50.xx, $99.xx, and $119.xx. (DSOF ¶¶ 32, 34.) Within those transactions, 60.7% of them ended in .00. (*Id.* ¶ 33.) Additionally, 42.5% ended in .99. (*Id.* ¶ 35.) The occurrence of these repeated transactions was greater than the expected average transaction frequency for dollar amounts.

- Pattern 2: 132 sets of transactions (consisting of 339 transactions) by 74 different households utilized a single household's EBT card repeatedly within a 24-hour period. (*Id.* ¶ 37.) 43 transaction sets involved multiple transactions completed within one minute. (*Id.* ¶ 38.) Similarly, there were 11 transaction sets with repeat amounts (i.e.,

transactions ending in .00, .50, or .99). (*Id.* ¶ 40.) These transactions were suspicious given the fact that the Store does not have shopping carts or baskets, the multiple steps necessary to complete a SNAP transaction, and the checkout area's layout. (*Id.* ¶ 39.)

- Pattern 3: FNS found unusually large transactions at the Store, some in excess of $100, despite the fact that the Store is a convenience store with limited, inexpensive stock. (*Id.* ¶ 44.) The Store does not offer shopping carts or baskets, as it has a small checkout counter and only two aisles worth of product. (*Id.* ¶ 25.)

- All patterns are indicative of trafficking when compared against EBT transactions at other nearby SNAP retailers and against EBT transactions conducted by the same SNAP benefit families. (*Id.* ¶¶ 49–52.) There are 33 other SNAP retailers within one mile of the Store, and several of these retailers are larger and offer a greater selection of SNAP-eligible products. (*Id.* ¶¶ 10, 49–50.)

To be sure, all of this evidence is circumstantial, but its cumulative effect is substantial. "Irregular patterns may emerge in virtually any retail operation, but a drumbeat of irregularities can be highly probative of unlawful conduct." *Irobe*, 890 F.3d at 380 (citing *Idias*, 359 F.3d at 698). The large number of suspicious transactions—nearly 1,000—is adequate to ground a strong inference of trafficking, especially when considered in conjunction with the Store's characteristics.

This inference is rebuttable—but, to do so, the Store must point to some significant, probative evidence to rebut it by a preponderance of the evidence standard and thereby fend off summary judgment. It fails to do so. The Store does not challenge the agency's data-compilation methodology, the reliability of the agency's historical data, or even the accuracy of the data. The Store does not attempt to legitimize even one of the transactions with any evidence and instead offers generalized conclusions entirely unsupported by concrete evidence. This is insufficient to meet its burden to rebut the ample transactional data.

B. **WHETHER THE SANCTION IMPOSED IS APPROPRIATE**

In this suit, the Store also challenges for the first time its permanent disqualification from the SNAP program in lieu of a civil monetary penalty. (Compl. ¶ 12; Opp'n Br. at 3.) The Charging Letter clearly instructed the Store, if it wished FNS to consider a civil monetary penalty,

13

to provide the appropriate documentation within ten days. DSOF ¶ 55. As Defendant notes, the Store neglected to indicate in its response to the Charging Letter that it was seeking the entry of a civil monetary penalty in place of a permanent ban, nor did it offer any evidence to indicate that it is even eligible for a civil monetary policy. (Reply at 3.)

To be eligible for a civil monetary penalty under the regulations, a store "shall, at a minimum, establish by substantial evidence its fulfillment" of four criteria: (1) "[the store] shall have developed an effective compliance policy as specified in § 278.6(i)(1);" (2) "[the store] shall establish that both its compliance policy and program were in operation at the location where the violation(s) occurred prior to the occurrence of violations cited in the charge letter sent to the [store];" (3) "[the store] had developed and instituted an effective personnel training program as specified in § 278.6(i)(2);" and (4) "[the store's] ownership was not aware of, did not approve, did not benefit from, or was not in any way involved in the conduct or approval of trafficking violations; or it is only the first occasion in which a member of [store] management was aware of, approved, benefited from, or was involved in the conduct of any trafficking violations by the [store]." 7 C.F.R. § 278.6(i). There is no indication in the administrative record that Plaintiff established these criteria. Nor has Plaintiff provided such evidence to the Court as part of its opposition to the Motion. Accordingly, the Court finds that Defendant was neither arbitrary nor capricious in reaching its decision to permanently disqualify the Store rather than issue a civil monetary penalty.

## V. CONCLUSION

For the reasons stated above, the Court will **GRANT** Defendant's Motion for Summary Judgment and enter **JUDGMENT** in favor of Defendant and against Plaintiff. An appropriate Order will follow.

Date: November 7, 2025

                                                s/ Zahid N. Quraishi  
                                                **ZAHID N. QURAISHI**  
                                                **UNITED STATES DISTRICT JUDGE**